54 P.3d 197 (2002)
113 Wash.App. 556
Richard Lee COUCH, et al., Respondents,
v.
WA. DEP'T OF CORRECTIONS, Appellant.
No. 26784-5-II.
Court of Appeals of Washington, Division 2.
September 20, 2002.
As Amended November 8, 2002.
*199 Michael Patrick Lynch, Glen Andrew Anderson, Steven Ray Meeks, Assistant Attorneys General, Michael E. Tardif, Asst. Atty. Gen. - Dl&i, Olympia, WA, for Appellant.
John Robert Connelly, Darrell L. Cochran, Gordon Thomas Honeywell, Tacoma, WA, for Respondents.
*198 MORGAN, J.
The main question in this case is whether the Department of Corrections (DOC) owes a duty of care to prevent future crimes while supervising an offender only for the purpose of collecting money. Answering no, we reverse with directions to dismiss.
On January 6, 1990, Cecil Davis assaulted a Tacoma couple. On March 12, 1990, in Pierce County cause number XX-X-XXXXX-X, he was convicted of assault in the second degree with a deadly weapon and criminal trespass in the first degree. On April 9, 1990, the court sentenced him to 26 months in prison, followed by a year of community placement. The court ordered him to pay $1,416.30[1] in fines, costs, and restitution (hereafter called "legal financial obligations" or "LFOs"), at a rate of at least $20 per month.
On July 24, 1991, Davis was released from prison and began his year of community placement. On July 24, 1992, he finished his year of community placement. He did not pay his LFOs while on community placement, so he remained on LFO supervision after July 24, 1992.
In August 1992, Davis stole property that belonged to another. On December 21, 1992, in Pierce County cause number XX-X-XXXXX-X, Davis pled guilty to theft in the third degree, a gross misdemeanor. The court sentenced him to "not more than 1 year" in jail, suspended on the condition that he successfully complete two years of probation and pay $2,562 in restitution and court costs at a rate of at least $25 per month.
In September 1992 and August 1993, Davis appeared in court to explain why he was not making monthly payments on his LFOs. The court did not penalize him on either occasion, presumably because he lacked money with which to pay.
In November 1993, a woman, G.A., was murdered. In late December of the same year, the police became "pretty interested in Mr. Davis and his possible involvement[.]"[2] Davis was never arrested or charged because, according to the investigating officer, "[w]e were not able to ever establish a direct link between him and the [G.A.] murder that would have given us probable cause to make an arrest."[3]
On December 26, 1993, a woman, T.H., was assaulted and raped. Davis was arrested within a few hours and charged with first-degree assault and first-degree rape. For the next thirteen months, he was held in jail awaiting trial. On February 6, 1995, he was released "when as a result of DNA testing charges against him were dismissed."[4]
On February 8, 1995, DOC reported to the court that Davis had failed to make payments on his LFOs in the 1992 misdemeanor case. Davis failed to appear for a scheduled hearing, so on May 12, 1995, the court issued an arrest warrant in that case.
On May 17, 1995, DOC reported to the court that Davis had failed to make payments on his LFOs in the 1990 felony case. DOC *200 did not seek a warrant in the felony case because a warrant was already outstanding in the misdemeanor case. DOC did "recommend that upon apprehension[ ] Mr. Davis be held in custody pending a Non-Compliance Hearing" in the felony case.[5]
On June 4, 1995, Davis was arrested for domestic violence assault. He was later found not guilty.
Also on June 4, 1995, Davis was arrested on the misdemeanor bench warrant from May 12, 1995. On June 5, 1995, the court held a hearing in the misdemeanor case, with Davis present. The court found that his "nonpayment of monetary obligations was not wilful" and "extend[ed] probation supervision until 6-5-96 for legal financial monitoring only[.]"[6] The court also ordered that Davis' payment of his LFOs be reviewed on December 8, 1995.
On September 4, 1995, a woman, J.W., was the subject of an attempted rape. The police suspected Davis, but they lacked enough evidence to arrest or charge him.
On December 8, 1995, Davis failed to appear for the misdemeanor LFO review hearing. Accordingly, the court issued a bench warrant for his arrest.[7]
On February 13, 1996, the prosecutor moved for an arrest warrant in the felony case. He alleged only that "[d]efendant has failed to make payments toward his/her legal financial obligations[.]"[8] On February 16, 1996, the court issued the warrant.
On April 20, 1996, Davis was arrested on one or both of the outstanding warrants, and on April 26, 1996, a hearing was held. Davis stipulated that he had willfully failed to pay his LFOs. The court accepted his stipulation and found that he had willfully failed to pay in both cases. In the misdemeanor case, the court "terminated supervision" (which since June 5, 1995 had been "for legal financial monitoring only"[9]); revoked its earlier suspension of Davis' sentence; and incarcerated Davis for the remainder of his statutory maximum term[10] (317 days with credit from April 20, 1996). In the felony case, the court ordered that Davis serve 60 days in jail,[11] concurrently with the 317 days on the misdemeanor; that Davis continue on felony LFO supervision only; and that Davis contact DOC "for reporting/payment instructions" when released from jail.[12]
Meanwhile, back on February 1, 1996, the officer investigating the J.W. attempted rape had asked the prosecutor to charge and obtain an arrest warrant for Davis. By early November 1996, despite "periodic conversations with the prosecutor[,]"[13] the officer still did not have a response from the prosecutor, and he wanted to know when Davis would be released from jail. Rather than inquiring of the jail itself, he called DOC, asked to speak with the person in charge of Davis' file, and was toldby "someone" whom he could not identify at trial[14]that Davis "wouldn't be released until after the first of the year."[15] He then "recontacted the prosecutor ... to urge them to expedite issuing the warrant, so [that he] could serve it while [Davis] was still incarcerated."[16]
On November 19, 1996, Davis was released from jail. He did not pay his LFOs or contact DOC.
On January 25, 1997, Davis murdered Yoshiko Couch. He was later charged, convicted, and sentenced to death for that crime.
Three days after Couch's murder, Davis was served with an arrest warrant in the *201 J.W. attempted rape. The prosecutor had requested the warrant on December 16, 1996, the court had issued it on December 19, 1996, and the investigating officer had learned of it "[s]ometime after the first of the year."[17]
Also after Couch's murder, Davis became a suspect in at least two more murders. One was the 1978 murder of S.M., and the other was the 1996 murder of L.H. Davis was not arrested or charged with either crime.
On October 8, 1999, Couch's estate[18] sued DOC. Before trial, DOC moved for summary judgment. It argued that its only duty at the time of Couch's death was "to collect the money owed the court by Davis."[19] It also argued that the estate could not prove proximate cause. The court denied the motion.
Also before trial, DOC moved to exclude evidence of the 1978 murder of S.M., the 1993 murder of G.A., the 1993 rape of T.H., the 1995 attempted rape of J.W., and the 1996 murder of L.H. DOC argued that such evidence would be irrelevant and unfairly prejudicial. The trial court denied the motion and later, during trial, admitted extensive evidence about those crimes over DOC's repeated objections.
On November 3, 2000, the jury returned a verdict in favor of Couch's estate. DOC moved unsuccessfully for judgment as a matter of law, new trial, or remittitur. The trial court entered judgment on the verdict, and DOC filed this appeal.
The elements of a negligence cause of action are duty, breach, causation, and damages.[20] We address duty before turning briefly to breach and causation.

I.
The first issue is whether DOC owed Couch a duty of care.[21] We address (A) the applicable general principles; (B) whether DOC owed such a duty due to its supervision in the felony case; and (C) whether DOC owed such a duty due to its supervision in the misdemeanor case.

A.
In general, an actor "has no duty to prevent a third person from causing physical injury to another."[22] An exception exists, however, when "a special relationship" between the actor and the third person "imposes a duty upon the actor to control the third person's conduct[.]"[23] Such a relationship must be "definite, established and continuing,"[24] but it need not be custodial.[25]
Although "various" relationships may "give rise to a duty to control a third person[,]"[26] the one needed here involves one person (a supervising officer) "tak[ing] charge" of another person (an offender).[27] *202 Thus, the Restatement provides that "[o]ne who takes charge of a third person whom he knows or should know to be likely to cause bodily harm to others if not controlled is under a duty to exercise reasonable care to control the third person to prevent him from doing such harm."[28]
To determine whether a supervising officer has "taken charge" of an offender within the meaning of Taggart v. State[29] and Restatement §§ 315 and 319, a court must examine "the nature of the relationship" between the officer and that person,[30] including all of that relationship's "[v]arious features[.]"[31] In most cases, two of the most important features, though not necessarily the only ones, will be the court order that put the offender on the supervising officer's caseload and the statutes that describe and circumscribe the officer's power to act.[32] A community corrections officer must have a court order before he or she can "take charge" of an offender; and even when he or she has such an order, he or she can only enforce it according to its terms and applicable statutes.
Three cases illustrate. In Taggart,[33] the trial court sentenced a man named Brock under the indeterminate sentencing scheme that applies to felonies committed before July 1, 1984. A parole officer later investigated whether Brock should be released on parole. The officer recommended that any release be "subject to special conditions, including that Brock complete a substance abuse program and submit to urinalysis testing to ensure that he was not using drugs or alcohol during parole."[34] The parole board granted parole, apparently on those and other conditions.[35] RCW 72.04A.080[36] mandated that the parole officer supervise "within the conditions of a parolee's release from custody." Stating that "[t]his statute is sufficient to establish ... a `definite, established and continuing relationship'" between parole officer and parolee,[37] the Supreme Court held that the parole officer had a duty to control the parolee's general conduct.[38]
In Bishop,[39] a court of limited jurisdiction sentenced Miche for DUI. It put him on probation and directed that he "abide by all terms, conditions, rules and regulations of the probation department."[40] Based on this order, and also with his agreement, his probation officer required that he attend inpatient *203 treatment, Alcoholics Anonymous, not consume alcohol, and submit to urine testing. Holding that these facts were enough to demonstrate the required "take-charge" relationship, the Supreme Court decided that the probation officer had a duty to control Miche's conduct.
In McKenna v. Edwards,[41] by way of contrast, "there [was] no order to supervise, no statute which would mandate supervision and no agreement to supervise."[42] The facts did not show the required "take charge" relationship, so Division Three declined to find that a pretrial release officer had a duty to control Edwards' general conduct.

B.
The first problem here is whether DOC had a "take-charge" relationship with Davis because it had Davis on LFO supervision in the felony case from July 25, 1992 to January 25, 1997.[43] Washington's felony LFO collection scheme dates from 1989,[44] though parts of it were in existence before then.[45] Its purposes are (1) to "assist[ ] the courts regarding the offender's [LFOs]"; (2) to "hold[ ] offenders accountable ... for the assessed costs associated with their crimes;" and (3) to provide remedies by means of which an individual or other entity can "recoup or at least defray" such costs.[46] To implement these purposes, a court may include an order to pay LFOs as a part of any felony sentence.[47] Such order may be collected by DOC,[48] or "enforced in the same manner as a judgment in a civil action by the party or entity to whom the legal financial obligation is owed."[49] Such an order "constitutes a condition and term of community supervision,"[50] and DOC shall supervise the offender's compliance with it for up to ten years.[51] During the period of supervision,
the offender may be required at the request of the department to report to the department for the purposes of reviewing the appropriateness of the collection schedule for the legal financial obligation. During this reporting, the offender is required under oath to truthfully and honestly respond to all questions concerning earning capabilities and the location and nature of all property or financial assets. Also, the offender is required to bring any and all documents as requested by the department in order to prepare the collection schedule.[[52]]
If an offender fails to pay and the failure is willful, the court can sentence him or her to not more than 60 days in jail per violation; but if the offender fails to pay and the failure is not willful, the court may only modify its order regarding payment.[53] Neither DOC *204 nor any of its employees is to be "liable under any circumstances for the payment of these [LFOs]."[54]
This LFO collection scheme authorizes the court to assess LFOs; DOC to enforce and collect LFOs; and a victim or other person to enforce and collect those LFOs reflecting his or her loss. Whether or not DOC properly enforces and collects LFOs, it shall not "under any circumstances" be liable for them.[55]
This LFO collection scheme does not impose on DOC a duty to prevent future crimes, as opposed to a duty to collect LFOs.[56] The scheme's purposes all relate to the collection of LFOs. DOC can require the offender to report, but only to facilitate the collection of LFOs. DOC can question the offender, but only on economic matters like earning capability and assets. So long as the offender pays the LFOs on schedule, DOC is not authorized to intervene in his or her other activities, even if it believes those activities to be criminaland if DOC is not authorized to intervene, it cannot have a duty to do so. Accordingly, we conclude that the LFO collection scheme does not empower DOC to supervise the general run of an offender's activities;[57] that the LFO collection scheme does not create the kind of "take-charge" relationship that Taggart and its progeny require; and that DOC did not owe Couch a duty of care because it had Davis on LFO supervision in the felony case.

C.
The second problem here is whether DOC had a "take-charge" relationship with Davis by virtue of its supervision in the misdemeanor case. This problem subdivides into (1) the period from December 21, 1992 to June 5, 1995; (2) the period from June 5, 1995 to April 26, 1996; and (3) the period from April 26, 1996 to January 25, 1997. After briefly considering the first and third periods, we focus on the second.
The first period (December 21, 1992 to June 5, 1995) is immaterial for present purposes. DOC had Davis on general misdemeanor probation during that time. This resulted, according to Hertog and Bishop, in a "take-charge" relationship and a general duty of care. But any breach that might have occurred during this period was clearly not a proximate cause of Couch's death on January 25, 1997.
The third period (April 26, 1996 to January 25, 1997) is also immaterial for present purposes. A superior court has discretion to terminate misdemeanor probation at any time.[58] The court in this case exercised that discretion by completely terminating Davis' misdemeanor probation on April 26, 1996. In doing so, it relieved DOC of all responsibility in the misdemeanor case and ended any duty that DOC might otherwise have had.
The second period is material for present purposes. Accordingly, we inquire whether the court had authority to modify Davis' probation at the hearing on June 5, 1995; whether one effect was to restrict DOC's authority to supervise; and whether a second effect was to eliminate any "take-charge" relationship that DOC and Davis might otherwise have had.
*205 Assuming without holding that Davis' misdemeanor probation had not ended by operation of law prior to June 5, 1995,[59] the court clearly had authority to modify Davis' probation. Washington's superior court misdemeanor probation statutes allow the judge to order supervision on such terms and conditions as the judge sees fit; to modify such terms and conditions during supervision; and to terminate supervision at any time.[60] In open court on June 5, the prosecutor, DOC and Davis all agreed that Davis' supervision should henceforth be "for legal financial monitoring only."[61] The judge had authority to agree also, and he properly modified Davis' probation by eliminating all probation conditions except those relating to LFOs.[62]
One effect of this modification was to restrict DOC's authority over Davis. Whereas DOC previously had authority to supervise him for all purposes, including the prevention of crime, it would henceforth have authority to monitor legal financial obligations only.
A second effect of this modification was to eliminate any "take-charge" relationship, and thus any general duty of care, that DOC and Davis might previously have had in the misdemeanor case. If DOC had authority to monitor Davis for legal financial obligations only, it lacked authority to monitor Davis for future criminal behavior; and if DOC lacked the ability to monitor Davis for future criminal behavior, it was not participating in a "take-charge" relationship of the kind that Taggart and its progeny require. Concluding this discussion of duty, we hold that DOC did not owe Couch a duty of care in the felony case at any time after July 25, 1992, and that DOC did not owe Couch a duty of care in the misdemeanor case at any time after June 5, 1995.

II.
Having analyzed duty, we turn briefly to breach and proximate cause. The estate alleges that DOC breached its duties in both the felony and misdemeanor cases in essentially four ways: (1) by not fully informing the judge at the April 26, 1996 hearing about Davis' alleged crimes and violations; (2) by misinforming the officer who, in October or November 1996, spoke on the phone to an unidentified person about when Davis would be released from jail; (3) by failing to violate Davis for not reporting after his release from jail on November 19, 1996; and (4) by not doing enough to monitor Davis' behavior after his release from jail on November 19, 1996.[63]
Taking the evidence in the light most favorable to the estate,[64] we first inquire *206 whether any these four allegations is sufficient to show that DOC breached a duty of care in either the felony or the misdemeanor case. Axiomatically, a legal duty must be breached while it is in effect; it cannot be breached before it has commenced or after it has ended. As shown above, DOC's duty of care in the felony case, if any, ended no later than July 25, 1992. DOC's duty of care in the misdemeanor case, if any, ended no later than June 5, 1995. The earliest of the estate's alleged breaches occurred on April 26, 1996. Accordingly, none of the estate's allegations is sufficient to show that DOC breached a duty of care in either the felony or the misdemeanor case.[65]
We do not overlook the estate's argument that a breach of duty is sometimes actionable even though the plaintiff's injury occurred after the duty ended.[66] That is trueand also immaterial. The question here is whether the breach occurred while the duty was in effect, not whether the injury occurred while the duty was in effect.
Finally, even if the estate's first allegation is assumed to be true (i.e., even if DOC did not fully inform the judge at the April 26, 1996 hearing), and even if that allegation could somehow have been a breach of a then-existing duty, the allegation could not possibly have been a cause in fact of the harm to Couch. The judge sentenced Davis to the maximum allowed by law, so even if he had known more, he could not have done more;[67] and if he could not have done more, the alleged failure to inform him bears no causal relation whatever to the harm later suffered by Couch.[68]
The foregoing discussion is enough to dispose of this appeal. Accordingly, we do not extend this opinion by discussing errors in the trial court's rulings on evidence and jury instructions. Concluding that DOC did not owe Couch an actionable duty of care at any material time, we reverse and remand with instructions to dismiss the complaint against DOC.
We concur: ARMSTRONG, J., and HUNT, C.J.
NOTES
[1] The court assessed part of this amount at sentencing and the rest later.
[2] Report of Proceedings (RP) at 557.
[3] RP at 558. At the time of trial in this case, G.A.'s murder was still "classified as an unsolved homicide[.]" RP at 572.
[4] Clerk's Papers (CP) at 59.
[5] Ex. 163, page 2.
[6] Ex. 248.
[7] The warrant is not in the record, but the fact of its issuance appears in Ex. 186.
[8] CP at 57.
[9] Ex. 248.
[10] See RCW 9A.20.021(2); RCW 9A.56.050; RCW 9.92.020.
[11] See former RCW 9.94A.200, currently codified as RCW 9.94A.634.
[12] CP at 67.
[13] RP at 581-582.
[14] RP at 570-71.
[15] RP at 570; see also RP at 588-89.
[16] RP at 571.
[17] RP at 584.
[18] We will refer to all plaintiffs collectively as "Couch's estate."
[19] CP at 74.
[20] Mucsi v. Graoch Assocs. Ltd. P'ship, 144 Wash.2d 847, 854, 31 P.3d 684 (2001); Mathis v. Ammons, 84 Wash.App. 411, 415-16, 928 P.2d 431, review denied 132 Wash.2d 1008, 940 P.2d 653 (1997).
[21] We have no occasion to consider whether this duty is one of reasonable care that can be breached by ordinary negligence, or one of slight care that can be breached only by gross negligence. See RCW 72.09.320, enacted in 1988, and RCW 9.95.204(7), enacted in 1996.
[22] Taggart v. State, 118 Wash.2d 195, 218, 822 P.2d 243 (1992); see also Bishop v. Miche, 137 Wash.2d 518, 524, 973 P.2d 465 (1999); Petersen v. State, 100 Wash.2d 421, 426, 671 P.2d 230 (1983); RESTATEMENT (SECOND) OF TORTS § 315 (1965).
[23] Taggart, 118 Wash.2d at 218, 822 P.2d 243 (quoting RESTATEMENT (SECOND) OF TORTS § 315); see also Bishop, 137 Wash.2d at 524, 973 P.2d 465.
[24] Hertog v. City of Seattle, 138 Wash.2d 265, 276, 288, 979 P.2d 400 (1999); Bishop, 137 Wash.2d at 524, 973 P.2d 465; Taggart, 118 Wash.2d at 219, 822 P.2d 243; Honcoop v. State, 111 Wash.2d 182, 193, 759 P.2d 1188 (1988).
[25] Hertog, 138 Wash.2d at 277, 979 P.2d 400; Bishop, 137 Wash.2d at 524, 528, 973 P.2d 465; Taggart, 118 Wash.2d at 223, 822 P.2d 243.
[26] Taggart, 118 Wash.2d at 219, 822 P.2d 243.
[27] Hertog, 138 Wash.2d at 277, 979 P.2d 400; Bishop, 137 Wash.2d at 524, 973 P.2d 465; Taggart, 118 Wash.2d at 219, 822 P.2d 243.
[28] Taggart, 118 Wash.2d at 219, 822 P.2d 243 (quoting RESTATEMENT (SECOND) OF TORTS § 319 (1965)).
[29] 118 Wash.2d 195, 822 P.2d 243 (1992).
[30] Bishop, 137 Wash.2d at 527, 973 P.2d 465 (whether supervising department "had a duty to control turned on the nature of the relationship" between department and offender); Hertog, 138 Wash.2d at 279, 979 P.2d 400 ("relevant inquiry is the relationship of the officer with" the offender); Bishop, 137 Wash.2d at 528, 973 P.2d 465 ("relevant inquiry is the relationship of the officer with" the offender).
[31] Taggart, 118 Wash.2d at 219, 822 P.2d 243.
[32] See Hertog, 138 Wash.2d at 277 n. 3, 979 P.2d 400 (relationship in Taggart was "defined" by statute; relationship in Semler v. Psychiatric Inst., 538 F.2d 121 (4th Cir.1976), was "defined" by court order).
[33] 118 Wash.2d 195, 822 P.2d 243.
[34] Taggart, 118 Wash.2d at 200, 822 P.2d 243.
[35] Unfortunately, the court's opinion does not show the conditions that the Board made part of Brock's parole. Under the sentencing scheme then in effect, it would have been normal for the Board to include the special conditions in the pre-parole plan, as well as a general condition requiring that Brock "obey all laws." See RCW 9.95.120 (implying that parole may be revoked without hearing if parolee is convicted of committing new criminal offense).
[36] RCW 72.04A.080 is not applicable to a felony committed on or after July 1, 1984. RCW 72.04A.900.
[37] Taggart, 118 Wash.2d at 219, 822 P.2d 243.
[38] For purposes of the indeterminate sentencing scheme that applies to felonies committed before July 1, 1984, Taggart held that the duty was one of ordinary care that could be violated by ordinary negligence. In 1988, at least for purposes of "community placement" under the SRA, the legislature provided that the duty is one of slight care that can be violated only by gross negligence. RCW 72.09.320. In 1996, the legislature provided similarly for misdemeanors. RCW 9.95.204(7).
[39] 137 Wash.2d 518, 973 P.2d 465.
[40] Bishop, 137 Wash.2d at 528, 973 P.2d 465.
[41] 65 Wash.App. 905, 830 P.2d 385, review denied, 120 Wash.2d 1003, 838 P.2d 1143 (1992).
[42] 65 Wash.App. at 918, 830 P.2d 385.
[43] The estate does not contend, nor could it contend successfully, that DOC's "community placement" relationship with Davis, which existed from July 25, 1991 to July 24, 1992, can be causally related to the murder of Couch on January 25, 1997.
[44] Laws of 1989, ch. 252.
[45] E.g., Laws of 1982, chapter 192, § 5. Both parties assume that all parts of the current LFO scheme apply to Davis' 1990 felony case. Although we assume likewise, we note in passing that Davis committed his offense on January 6, 1990, and that some parts of the LFO system did not take effect until July 1, 1990. Laws of 1989, chapter 252, § 30(1).
[46] Laws of 1989, ch. 252, § 1.
[47] Laws of 1989, ch. 252, § 3(1), currently codified as RCW 9.94A.760(1).
[48] Laws of 1989, ch. 252, § 3(6), currently codified as RCW 9.94A.760(8).
[49] Laws of 1989, ch. 252, § 3(2), currently codified as RCW 9.94A.760(4).
[50] Laws of 1989, ch. 252, § 3(8), currently codified as RCW 9.94A.760(10).
[51] Laws of 1989, ch. 252, § 4(10), re-enacting a portion of Laws of 1982, ch. 192, § 5(1), currently codified as 9.94A.760(4); see also Laws of 1989, ch. 252, § 4(12), re-enacting a portion of Laws of 1984, ch. 209, § 6(11). As to the ten year duration of supervision, see Laws of 1989, ch. 252, § 3(2), currently codified as RCW 9.94A.760(4).
[52] Laws of 1989, ch. 252, § 3(5) (emphasis added), currently codified as RCW 9.94A.760(7).
[53] Laws of 1989, ch. 252, § 3(8), 7(2)(b), (2)(c), currently codified as RCW 9.94A.634(3)(c), (d); State v. Curry, 118 Wash.2d 911, 918, 829 P.2d 166 (1992) ("no defendant will be incarcerated for his or her inability to pay the penalty assessment unless the violation is willful"); State v. Gropper, 76 Wash.App. 882, 887, 888 P.2d 1211 (1995); State v. Bower, 64 Wash.App. 227, 230, 823 P.2d 1171 (1992); cf. Bearden v. Georgia, 461 U.S. 660, 668-69, 103 S.Ct. 2064, 76 L.Ed.2d 221 (1983).
[54] Laws of 1989, ch. 252, § 4(10), currently codified as RCW 9.94A.760(13).
[55] Laws of 1989, ch. 252, § 4(10), currently codified as RCW 9.94A.760(13).
[56] We do not hold that DOC has a duty to collect LFOs, as opposed to authority to collect LFOs. Even if we did so hold, however, DOC would owe that duty to the LFO payees, not to the public as a whole. In this case then, it could not have owed such a duty to Couch.
[57] Cf. State v. Barclay, 51 Wash.App. 404, 405, 407, 753 P.2d 1015 (1988) (under SRA, court cannot condition community placement on repeat offender not "violat[ing] any local, state or federal criminal statute, law or ordinance"); DAVID BOERNER, SENTENCING IN WASHINGTON at § 4, 4-5 to 4-6 (1985) (CCO's power "is restricted by the nature of the conditions or requirements of sentences permitted under the [SRA]").
[58] RCW 9.95.230; RCW 9.92.064.
[59] DOC argues that Davis' misdemeanor probation terminated by operation of law on December 21, 1994. It reasons, based on City of Spokane v. Del Marquette, 103 Wash.App. 792, 14 P.3d 832 (2000), rev'd, 146 Wash.2d 124, 43 P.3d 502 (2002) and Gillespie v. State, 17 Wash.App. 363, 563 P.2d 1272, review denied, 89 Wash.2d 1008 (1977) that "[a]lthough probation is tolled when an offender has absconded and is incarcerated in another jurisdiction, probation is not tolled when an offender has not left the jurisdiction and is amenable to process." Br. of Appellant at 43 n. 15; see RCW 9.95.210(1); RCW 9.92.064. We need not reach this argument to dispose of this case.
[60] E.g., RCW 9.95.200(1) (court may summarily grant or deny probation and may determine the conditions of such probation); RCW 9.95.210(1), (2) (court may suspend sentence and may direct that the suspension may continue upon such conditions and for such time as it shall designate); RCW 9.95.230 (prior to order terminating probation, court has the authority to revoke, modify, or change its order of suspension of imposition or execution of sentence; court has the authority to terminate the period of probation); see also RCW 9.92.060(1), (2) (superior court may suspend sentence and may direct that the sentenced person be placed under the charge of a community corrections officer); RCW 9.92.064 (court shall establish a definite termination date for the suspended sentence).
[61] Ex. 248; Ex. 250.
[62] RCW 9.92.064; RCW 9.95.230.
[63] The estate makes this last claim in two forms. First, it says that DOC classified Davis as a "Level 5B" offender, with the result that it did not do enough to monitor his behavior following his release from jail. Br. of Resp't at 35. Second, the estate says that regardless of whether Davis was properly classified, DOC did not do enough to monitor his behavior following his release from jail. Br. of Resp't at 37-38. The claim is the same, regardless of which form is used.
[64] Stiley v. Block, 130 Wash.2d 486, 504-505, 925 P.2d 194 (1996); Westby v. Gorsuch, 112 Wash.App. 558, 562, 50 P.3d 284 (2002); Maxwell v. Piper, 92 Wash.App. 471, 476, 963 P.2d 941 (1998).
[65] We do not overlook the estate's attempt to support its second allegation (that DOC breached its duty because some unidentified person at DOC told an inquiring police officer over the phone that Davis would not be released until after the first of the year) with an alternative argument. Citing RESTATEMENT (SECOND) OF TORTS § 324A (1965) and the common law's rescue doctrine, the estate contends that "even if DOC had no independent duty to provide information to the police, once DOC undertook to provide information it had a common law duty to make sure the information was accurate." Br. of Resp't at 33. In our view, however, this alternative argument adds nothing that requires separate discussion in the main text. Assuming (without holding) that DOC somehow acquired a duty to the police when the unidentified person spoke on the phone to the officer, DOC did not thereby acquire a duty to Couch. In October and November 1996, DOC owed a duty of care to Couch only if its conduct fell within an exception to the public duty doctrine. See e.g., Babcock v. Mason County Fire Dist., 144 Wash.2d 774, 30 P.3d 1261 (2001); Bailey v. Town of Forks, 108 Wash.2d 262, 737 P.2d 1257 (1987); Phillips v. King County, 87 Wash.App. 468, 943 P.2d 306 (1997). The only exceptions that might apply are the rescue exception (see the third exception listed in Bailey, 108 Wash.2d at 268, 737 P.2d 1257) and the "special relationship" exception (see the fourth exception listed in Bailey, 108 Wash.2d at 268, 737 P.2d 1257). DOC never undertook to rescue Couch or any other specific person, so that exception (including RESTATEMENT OF TORTS § 324A) does not apply. The "special relationship" exception lies at the core of Taggart and its progeny, and whether it applies here is discussed at length in Section I.
[66] See Br. of Resp't at 25.
[67] The estate's reliance on State v. McDougal, 120 Wash.2d 334, 351-52, 841 P.2d 1232 (1992), is misplaced. See Br. of Resp't at 47. That a judge can impose time in excess of the standard range, as in McDougal, has no bearing on whether a judge can impose time in excess of the statutory maximum sentence.
[68] The estate may also be suggesting that if the judge had been better informed, he might have ordered that the 317 days on the misdemeanor run consecutively with 60 days on the felony. Even if one assumes that is so, however, Davis would still not have been in jail on January 25, 1997. We also note that the law or the prosecutor, not DOC, controlled the number of failure-to-pay violations that the court considered on April 26, 1996. See CP at 57-58.