# IN THE COURT OF APPEALS OF THE STATE OF WASHINGTON

CATHY HARPER, individually, as
Personal Representative of the
ESTATE OF TRICIA PATRICELLI, as
Guardian ad Litem for KHALANI
MICHAEL, a minor child, and as
Guardian ad Litem for NIYERRAH
MICHAEL, a minor child,

    Appellant,

  v.

STATE OF WASHINGTON;
WASHINGTON DEPARTMENT OF
CORRECTIONS, a governmental
entity,

    Respondents,

RHONDA FREELAND and JOHN DOE
FREELAND, and their marital
community

    Defendants.

)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)

DIVISION ONE

No. 76008-4-I

ORDER DENYING MOTION FOR
RECONSIDERATION AND ORDER
WITHDRAWING OPINION AND
SUBSTITUTING OPINION

The respondent, State of Washington Department of Corrections, having filed a motion for reconsideration of the court's opinion filed December 4, 2017, and a majority of the panel having determined that the motion should be denied, now, therefore it is hereby

ORDERED that the respondent's motion for reconsideration is denied; and it is further

No. 76008-4-I/2

ORDERED that the opinion filed on December 4, 2017 is withdrawn; and it is further

ORDERED that a substitute opinion shall be filed to correct a factual conclusion, and the substituted opinion shall be published in the Washington Appellate Reports.

_____
Dwyer, J.

_____
Appelwick

_____
Becker, J.

FILED
COURT OF APPEALS DIV I
STATE OF WASHINGTON

2018 JAN 16 PM 12: 27

# IN THE COURT OF APPEALS OF THE STATE OF WASHINGTON

CATHY HARPER, individually, as
Personal Representative of the
ESTATE OF TRICIA PATRICELLI, as
Guardian ad Litem for KHALANI
MICHAEL, a minor child, and as
Guardian ad Litem for NIYERRAH
MICHAEL, a minor child,

                Appellant,

          v.

STATE OF WASHINGTON;
WASHINGTON DEPARTMENT OF
CORRECTIONS, a governmental
entity,

                Respondents,

RHONDA FREELAND and JOHN DOE
FREELAND, and their marital
community

                Defendants.

)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)

DIVISION ONE

No. 76008-4-I

PUBLISHED OPINION

FILED: January 16, 2018

FILED
COURT OF APPEALS DIV. 1
STATE OF WASHINGTON
2018 JAN 16 PM 12: 27

DWYER, J. — Cathy Harper, personal representative of the estate of Tricia

Patricelli, appeals from the trial court's order granting summary judgment to the

Department of Corrections (DOC) and dismissing her lawsuit. On appeal, Harper

contends that the trial court erred because genuine issues of material fact exist

as to whether DOC breached its take charge duty owed toward Patricelli in its supervision of Scottye Miller.

We conclude that genuine issues of material fact remain for trial as to whether DOC exercised less than slight care in its supervision of Miller. Accordingly, we reverse.

I

DOC was assigned to supervise Miller during his term of community placement to begin on October 15, 2012. Prior to this term of community placement, Miller had a lengthy criminal record, much of it involving crimes of domestic violence against Patricelli, Harper's daughter. Specifically, Miller had been convicted of 4 domestic violence felonies, 2 of which were against Patricelli, and 18 domestic violence misdemeanors, 4 of which were against Patricelli.

In addition, multiple no-contact orders had been issued against Miller, barring him from interacting with Patricelli. In the past, Miller had repeatedly violated these no-contact orders and lied to his community corrections officers when asked whether he was residing with Patricelli.

Upon his release from incarceration on October 15, Miller was placed under the supervision of DOC community corrections officer Rhonda Freeland. At the time of his release, Miller was to be supervised by DOC as a misdemeanor domestic violence offender.[1] A no-contact order in place at the time of Miller's

---

[1] Miller's misdemeanant supervision was in part due to a prior conviction for violation of a no-contact order prohibiting him from contacting Patricelli.

release effectively prohibited him from having physical contact with Patricelli but permitted him to have telephone contact with her.[2]

On October 16, Miller reported to Freeland at her Auburn office. While there, Miller was subjected to a urinalysis test to monitor his drug and alcohol use. The test results were negative, indicating that Miller had not used drugs or alcohol since his release from incarceration the day before.

Pursuant to DOC policy, Freeland asked Miller where he would be residing. Miller indicated that he was homeless but that he would be staying with his mother, Leola Benson, as well as with nearby relatives. Freeland required that Miller report to her office weekly and complete a housing report log, a form document listing where he resided each night to be verified by the signature of the person with whom he had resided. Because Miller was subject to community placement pursuant to a misdemeanor conviction—rather than a felony conviction—DOC's policy did not require that Miller establish an approved address upon his release from incarceration.

Over the next two days, Freeland made several telephone calls. First, she contacted Miller's previous mental health counselor, who told her that Miller would be required to sign up for mental health services and to schedule an intake appointment.[3] Freeland then contacted Dave Albers, a King County probation officer who had supervised Miller in 2010 and 2011, to inform him of the community custody conditions that were imposed on Miller and of her

---

[2] The no-contact order permitted Miller to have personal contact with Patricelli in the event that he was incarcerated or in residential chemical dependency treatment.

[3] Freeland received verification the next day that Miller had scheduled an intake appointment to begin receiving mental health services.

assignment as supervisor of Miller's community placement. Freeland telephoned Patricelli and left a message for her, requesting a return call. Freeland did not again attempt to contact Patricelli.

Freeland also contacted Angela Coker, who was currently assigned to Patricelli as a DOC community victim liaison due to Miller's prior crimes of domestic violence against Patricelli. In the time leading up to Freeland's supervision of Miller, Coker had successfully contacted Patricelli using a different telephone number than the number dialed by Freeland. Coker told Freeland that she had spoken with Patricelli and that Patricelli said that she had changed residences, believed that Miller did not know where she would be living, and was aware that she could contact DOC or the police if she saw Miller.

On October 23, seven days after his initial visit, Miller again reported to Freeland's office. He was subjected to another urinalysis test, the result of which was negative for drug or alcohol use. He gave Freeland a completed housing report log with Benson's signature placed thereon, suggesting that he had been residing with Benson for the past week. Miller also brought Freeland verification of food assistance benefits and acknowledged that he had a psychological examination scheduled for October 24. Freeland directed Miller to report to her again on October 30.

On October 29, Benson contacted Freeland and indicated that she would be willing to let Miller live with her at her residence going forward. Freeland did not inquire of Benson as to whether Miller had been staying at her residence for the past two weeks. Freeland thereafter sent an e-mail to Coker inquiring into

whether the area surrounding Benson's address was associated with any of Miller's past domestic violence victims. Coker responded that there were no known security concerns regarding Benson's address.

On October 30, Harper visited Patricelli's apartment. Inside the apartment, she found Patricelli's body, the victim of multiple stab wounds. Harper believed Patricelli to be dead, and she was later pronounced as such by medical personnel. Miller was later convicted of Patricelli's murder.

Harper sued DOC alleging gross negligence and negligent infliction of emotional distress. DOC moved for summary judgment as to both claims. The trial court granted summary judgment of dismissal.

## II

Harper contends that the trial court erred by granting summary judgment as to her gross negligence claim. The trial court erred, Harper asserts, because genuine questions of material fact remain for trial as to whether DOC breached its take charge duty in its supervision of Miller upon his release from incarceration. We agree.

## A

Summary judgment is proper where there are no genuine issues of material fact and the moving party is entitled to judgment as a matter of law. Hertog v. City of Seattle, 138 Wn.2d 265, 275, 979 P.2d 400 (1999). We engage in the same inquiry as the trial court and consider the facts and reasonable inferences therefrom in the light most favorable to the nonmoving party. Hertog, 138 Wn.2d at 275.

B

DOC's community corrections officers have a "take charge" duty over the offenders they supervise. Taggart v. State, 118 Wn.2d 195, 219, 822 P.2d 243 (1992). Our Supreme Court announced the existence of this duty with reference to the special relationship provision in the Restatement (Second) of Torts, § 319 (1965), which reads: "'One who takes charge of a third person whom he knows or should know to be likely to cause bodily harm to others if not controlled is under a duty to exercise reasonable care to control the third person to prevent him from doing such harm.'" Taggart, 118 Wn.2d at 219.

Applying this duty to parole officers, our Supreme Court in Taggart held that, "parole officers have a duty to protect others from reasonably foreseeable dangers engendered by parolees' dangerous propensities." 118 Wn.2d at 224. "When a parolee's criminal history and progress during parole show that the parolee is likely to cause bodily harm to others if not controlled," the court continued, "the parole officer is under a duty to exercise reasonable care to control the parolee and to prevent him or her from doing such harm." Taggart, 118 Wn.2d at 220. Thus, DOC's duty when supervising offenders is the "take charge" duty set forth in Taggart.

Statutory provisions and an offender's sentencing conditions are not the origin of the duty. Mock v. Dep't of Corr., ___ Wn. App ___, 403 P.3d 102, 108 (2017). Rather, the conditions of the sentence and the statutory authority

-6-

granted to DOC inform the contours of the special relationship duty discussed in

Taggart. Mock, 403 P.3d at 108.[4]

> "Once the relationship is created, it is the *relationship* itself which ultimately imposes the duty upon the government." Joyce v. Dep't of Corr., 155 Wn.2d 306, 318-19, 119 P.3d 825 (2005). The section 319 duty—also referred to as the "take charge" duty—is imposed only when there is a " 'definite, established and continuing relationship between the defendant and the third party.' " Taggart, 118 Wn.2d at 219 (quoting Honcoop v. State, 111 Wn.2d 182, 193, 759 P.2d 1188 (1988)). It has been imposed on community corrections officers as well as parole officers and probation officers. Joyce, 155 Wn.2d at 320; Taggart, 118 Wn.2d at 224; Bishop [v. Miche], 137 Wn.2d [518,] 528-29, 531[, 973 P.2d 465 (1999)].
>
> . . . .
>
> Whether the department owed plaintiffs a section 319 duty actionable in the circumstances of this case depends on the terms defining [the community corrections officer's] relationship with [the offender]. See Bishop, 137 Wn.2d at 528 ("The relevant inquiry is the relationship of the officer with the parolee.") Statutes and conditions of sentence are relevant to this inquiry. Taggart, 118 Wn.2d at 219; Bishop, 137 Wn.2d at 528-29, 531; Joyce, 155 Wn.2d at 317, 319-20. The tort of negligent supervision is not unlimited. If the department "is not authorized to intervene, it cannot have a duty to do so." Couch v. Dep't of Corr., 113 Wn. App. 556, 569, 54 P.3d 197 (2002), review denied, 149 Wn.2d 1012, 69 P.3d 874 (2003); Joyce, 155 Wn.2d at 320 n.3.

Mock, 403 P.3d at 108.

---

[4] A claim that DOC made during oral argument with regard to instructing the jury on its take charge duty bears mentioning. Specifically, DOC claimed that it is unnecessary to instruct the jury as to the take charge duty so long as the jury is instructed as to the gross negligence standard.

This is incorrect. We have never held that instructing the jury as to a party's duty in a special relationship case is unnecessary. Indeed, we have expressly rejected that proposition, reversing trial court decisions when the jury was not instructed as to the applicable common law special relationship duty. See, e.g., Hendrickson v. Moses Lake Sch. Dist., 199 Wn. App. 244, 247-49, 398 P.3d 1199 (2017); Quynn v. Bellevue Sch. Dist., 195 Wn. App. 627, 641, 383 P.3d 1053 (2016); Hopkins v. Seattle Pub. Sch. Dist. No. 1, 195 Wn. App. 96, 103, 107-08, 380 P.3d 584, review denied, 186 Wn.2d 1029 (2016).

C

Harper contends that genuine issues of material fact remain for trial as to whether DOC breached its take charge duty toward Patricelli while supervising Miller.

The statutory provision guiding whether DOC and its community corrections officers breached their take charge duty while rendering community placement activities is set forth in RCW 72.09.320. The statute provides:

> **Community placement—Liability.** The state of Washington, the department and its employees, community corrections officers, their staff, and volunteers who assist community corrections officers in the community placement program *are not liable for civil damages resulting from any act or omission in the rendering of community placement activities unless the act or omission constitutes gross negligence.*

RCW 72.09.320 (emphasis added).

Thus, DOC and its correctional officers breach their take charge duty when they are grossly negligent in rendering community placement activities. A weathered but still vital Supreme Court opinion explicates upon the quantum of care that constitutes gross negligence.

1

More than half a century ago, our Supreme Court decided Nist v. Tudor, 67 Wn.2d 322, 407 P.2d 798 (1965), a vehicular collision case that impelled the court to undertake a "study of gross negligence." Nist, 67 Wn.2d at 323. The court's opinion, authored by Justice Hale, acknowledged at the outset that

> [a] review of the commentaries, scholarly treaties and case law on gross negligence shows the term to have universally escaped definition, and despite the most assiduous efforts to give it precision it retains its amorphous quality. Every qualifying word

added to sharpen the phrase seems to obscure in about the same degree as it clarifies it and inevitably invites further definition. Or, standing alone in its self-contained significance, great negligence, the idea remains extremely difficult for the trial courts to apply in specific situations. The problem ever remains: Was there sufficient proof of great negligence to submit the issue to the jury?

Nist, 67 Wn.2d at 325 (footnote omitted). The court then reviewed its decades-old decisions, noting that, "[a]lthough retaining slight care as a standard, this court has in recent years, where there is substantial evidence of acts or omissions seriously negligent in character, inclined toward leaving the question of gross negligence to the jury." Nist, 67 Wn.2d at 326.

Thereafter, the court set out to clarify the gross negligence standard:

We have many times said that failure to exercise slight care is gross negligence within the meaning of the motor vehicle statutes. Since this statement seems as appropriate in describing the concept as the other definitions offered, we should amplify the definition so that it may be more readily applied by the trial courts in given situations.

Gross negligence may be more readily understood if anchored to or guided by other more understandable concepts, and ought to be directly related to the hazards of the occasion in which it is invoked. Palsgraf v. Long Island R. Co., 248 N.Y. 339, 162 N.E. 99, 59 A.L.R. 1253 (1928). A gentle push of one window washer by another may be merely a playful gesture and of only the slightest negligence when both are standing in a basement window well, but put the same two men on the window ledge of a skyscraper, 30 stories above the ground, and the same playful gesture becomes an act of the grossest negligence, if not one of wanton depravity.

The term *gross negligence*, then, to have practical validity in the trial of a cause, should be related to and connected with the law's polestar on the subject, ordinary negligence. . . . Gross negligence, being a form of negligence on a larger scale, must also, like ordinary negligence, derive from foreseeability of the hazards out of which the injury arises.

It means, therefore, gross or great negligence, that is, negligence substantially and appreciably greater than ordinary negligence. Its correlative, failure to exercise slight care, means not the total absence of care but care substantially or appreciably

less than the quantum of care inhering in ordinary negligence. In determining the degree of negligence, the law must necessarily look to the hazards of the situation confronting the actor.

Nist, 67 Wn.2d at 330-31.

As one pertinent application of the gross negligence standard, the Nist court discussed its decision in Emery v. Milk, 62 Wn.2d 617, 384 P.2d 133 (1963), in which the court observed that although

the host driver demonstrated a number of the elements of care by driving in her proper lane with her lights on, keeping her car under control, we said that failure to stop at a stop sign and yield the right of way in driving through an obstructed intersection provided evidence of gross negligence, creating an issue of fact for the jury.

67 Wn.2d at 328. The court emphasized that, in Emery, "[t]he elements of care shown in controlling and operating the car did not cancel the elements of gross negligence implicit in driving across an obstructed arterial street at 30 miles per hour without stopping." Nist, 67 Wn.2d at 328.

With this framework, the Nist court proceeded to address the merits of the case before it.

Although Mrs. Tudor, the driver, had slowed her car to a near stop, had her left-turn blinker signal on to warn following cars and waited for them to go by, her negligence, if any, should therefore, be measured in the case not by dangers from following cars but from the hazards whereof plaintiff received her injuries— the oncoming truck. Any care or prudence exerted by the defendant driver here had reference to following cars and little or no relationship to the hazards generated by the approaching truck, for the truck had the right of way, and the duty to yield rested upon the Tudor car before making its left turn.

Neither slowing down, nor signaling, nor looking toward a truck coming toward her on a clear, dry day on a straight, level road reduced the hazards from so imminent and perceptible a danger unless her actions suited the needs of the occasion. Her acts and omissions in turning suddenly into so obvious a danger supplied evidence from which a jury could well infer that she acted in the exercise of so small a degree of care under the circumstances as to

be substantially and appreciably more negligent than ordinary, and hence could be held guilty of gross or great negligence.

Nist, 67 Wn.2d at 331-32.

Given that, the court instructed:

If there is substantial evidence of seriously negligent acts or omissions on the part of the host driver, then the issue of gross negligence should be resolved by the jury under proper instructions.
. . . .
Because gross negligence is a species of aggravated negligence, the jury should have an understanding of what the law means by ordinary negligence so that it may have a basis of comparison; consequently, the jury should be given the benefit of the law's classic definition of negligence coupled with the definition of and the rule concerning proximate cause. . . .
Finally, we believe the jury—having received the classic definition of ordinary negligence—will better understand the idea of gross negligence if it is informed that gross negligence means what the term implies—great negligence, negligence substantially or appreciably greater than ordinary negligence.

Nist, 67 Wn.2d at 332-33.

In the present case, if the question of whether DOC was grossly negligent in its community placement actions was put to a jury, the law summarized in the Washington Pattern Jury Instructions regarding ordinary negligence, ordinary care, and gross negligence would be pertinent. These instructions read:

WPI 10.01
NEGLIGENCE—ADULT—DEFINITION
Negligence is the failure to exercise ordinary care. It is the doing of some act that a reasonably careful person would not do under the same or similar circumstances or the failure to do some act that a reasonably careful person would have done under the same or similar circumstances.

WPI 10.02
ORDINARY CARE—ADULT—DEFINITION
Ordinary care means the care a reasonably careful person would exercise under the same or similar circumstances.

WPI 10.07
GROSS NEGLIGENCE—DEFINITION
Gross negligence is the failure to exercise slight care. It is negligence that is substantially greater than ordinary negligence. Failure to exercise slight care does not mean the total absence of care but care substantially less than ordinary care.

6 WASHINGTON PRACTICE: WASHINGTON PATTERN JURY INSTRUCTIONS: CIVIL 10.01, .02, .07, at 124, 126, 132 (6th ed. 2012) (boldface omitted).

In summary, as Justice Hale well-illustrated with his example of the window washers, the sufficiency of evidence of gross negligence is not merely a function of the quantity of evidence presented, it is also a function of the significance the jury could give to that evidence in light of the foreseeable danger. It is in this latter respect that the distinction between ordinary negligence and gross negligence will often be manifest. But the drawing of such distinction will almost always require the fact-finding judgment of a jury, as opposed to the legal analysis of a court.

2

We must next determine whether genuine issues of material fact exist as to whether DOC breached its take charge duty owed to Patricelli.

Our analysis necessarily focuses on the sentencing condition most pertinent to Patricelli's safety—the no-contact order. Just as with the driver in Nist, that DOC may have exercised the appropriate care with regard to other factors does not, as a matter of law, "cancel," Nist, 67 Wn.2d at 328, the evidence of gross negligence regarding the enforcement of the no-contact order.

First, Freeland attested during her deposition that she possessed a physical copy of Miller's field file and had access to DOC's electronic offender management system. This is significant because these records detailed that Miller had a long history of violating no-contact orders prohibiting him from contacting Patricelli and of lying to community corrections officers when asked if he was contacting or residing with Patricelli.

Next, Freeland attested in her deposition that, in determining whether Miller had truthfully filled out his housing report log, "I can't assume that he's always lying to me, but I can't always assume that he's telling me the truth." Accordingly, viewed in the light most favorable to Harper, Freeland reviewed Miller's housing report logs in the same manner as she would have with any other offender, notwithstanding Miller's clear record of violating no-contact orders so that he could reside with Patricelli and lying to DOC officers about whether he had been residing with her.

Furthermore, the parties do not dispute that Freeland made only one attempt to contact Patricelli by telephone in the two weeks of her supervision of Miller—an attempt that was unsuccessful. This is significant because available to Freeland in DOC's electronic records system was another telephone number for Patricelli at which she had been successfully contacted in the weeks leading up to her murder. However, Freeland did not make any attempt to contact Patricelli using the alternative telephone number.

Lastly, when Benton called Freeland to indicate that Miller could reside with her going forward, Freeland did not ask Benton whether Miller had, in

actuality, been residing with her during his community placement, as Miller's housing report logs suggested. If Freeland had the requisite level of familiarity with Miller's record of lying about where he had been residing, she would have been more likely to inquire into whether he had actually been staying with Benton during his term of community placement. This is significant because it would have given Freeland a basis on which to inquire into whether Miller had violated the no-contact order.

Taking all reasonable inferences in favor of Harper, a jury could find that, notwithstanding the steps that were taken in discharge of the take charge duty, Nist, 67 Wn.2d at 328, these facts support a conclusion that, with regard to the no-contact order, DOC exercised less than slight care in its supervision of Miller, thereby breaching its applicable duty.

Accordingly, the trial court erred by granting summary judgment of dismissal.[5]

## III

Harper also contends that she may prevail on her negligent infliction of emotional distress claim by establishing ordinary negligence, rather than gross negligence, on the part of DOC in its rendering of community placement activities. Harper is wrong.

Again, RCW 72.09.320 provides:

---

[5] We do not consider DOC's claim that Harper failed to establish proximate cause because DOC did not present this argument to the trial court in its opening summary judgment materials. King v. Rice, 146 Wn. App. 662, 668, 191 P.3d 946 (2008) (citing White v. Kent Med. Ctr., Inc., P.S., 61 Wn. App. 163, 169, 810 P.2d 4 (1991)).

We further emphasize that our determination is restricted to the circumstances of this case. No record was made of the abilities or authorization to intervene applicable to probation officers in limited jurisdiction courts. Cf. Couch, 113 Wn. App. at 569.

> **Community placement—Liability.** The state of Washington, the department and its employees, community corrections officers, their staff, and volunteers who assist community corrections officers in the community placement program *are not liable for civil damages resulting from any act or omission in the rendering of community placement activities unless the act or omission constitutes gross negligence.*

(Emphasis added.) Accordingly, in a civil action against DOC regarding its rendering of community placement activities, no liability attaches to DOC for any act or omission unless the act or omission constitutes gross negligence.

Harper's negligent infliction of emotional distress claim is a civil action against DOC regarding its rendering of community placement activities. Thus, as a predicate to establishing her negligent infliction of emotional distress claim against DOC, Harper must establish that DOC acted with gross negligence, rather than ordinary negligence. Harper's contrary contention fails.

However, given our resolution of the first issue presented, it follows that the trial court also erred by dismissing Harper's negligent infliction of emotional distress claim.

Reversed.

We concur:

_____

_____ Dwyer, J.

_____ Appelwick

_____ Becker, J.