

IN THE COURT OF APPEALS OF THE STATE OF WASHINGTON

| | | |
|---|---|---|
| STATE OF WASHINGTON, | ) | No. 71701-4-I |
| | ) | |
| Respondent, | ) | DIVISION ONE |
| | ) | |
| v. | ) | |
| | ) | |
| SALLYEA O. McCLINTON, | ) | PUBLISHED OPINION |
| | ) | |
| Appellant. | ) | FILED: April 6, 2015 |
| | ) | |

BECKER, J. — This appeal questions the authority of the Department of Corrections to use GPS (Global Positioning System) monitoring to keep track of a sex offender who is serving the community custody portion of a sentence imposed for crimes committed in 1995. In 1995, the statutes regulating supervision of community custody did not specifically provide the Department with authority to use GPS monitoring. But they did give the Department the responsibility to monitor court-imposed conditions of sentence. Here, the court imposed geographical limitations on the offender's movements while in community custody. We conclude it is within the Department's authority to impose GPS monitoring to assure a 1995 sex offender complies with those court-imposed conditions.

A jury convicted appellant Sallyea McClinton of three offenses: first degree rape while armed with a deadly weapon, attempted rape in the first degree, and

first degree burglary. In 1997, the court imposed a sentence of 226 months in prison followed by 24 months of community custody, as required by former RCW 9.94A.120(9)(b) (1995).

McClinton began his term of community custody in June 2013. By the terms of his sentence, he was under the supervision of community corrections officers employed by the Department of Corrections.

In November 2013, a community corrections officer ordered McClinton to report to have a GPS monitoring device installed on his person. McClinton disregarded this order. A court determined that he had violated the conditions of his sentence and imposed 240 days of confinement as a sanction. McClinton appeals. He contends that the court was without authority to sanction him for failing to submit to GPS monitoring because the Department lacked authority to require it.

The issue is technically moot. Because McClinton has already served the term of confinement imposed for this violation, we cannot afford relief. We nevertheless exercise our discretion to hear the matter in order to provide an authoritative determination of an issue that is likely to recur. In re Pers. Restraint of Mattson, 166 Wn.2d 730, 736, 214 P.3d 141 (2009).

The issue requires the court to interpret sentencing statutes. Interpretation of a statute is a question of law that appellate courts review de novo. In re Post Sentencing Review of Charles, 135 Wn.2d 239, 245, 955 P.2d 798 (1998).

The terms of a defendant's sentence are governed by the version of the Sentencing Reform Act in effect when the crime was committed. State v. Medina, 180 Wn.2d 282, 287, 324 P.3d 682 (2014). McClinton's crimes were committed in September and October of 1995. Our citations to the Act refer to the version in effect at that time.

McClinton contends the analytical framework for his case is found in In re Personal Restraint of Capello, 106 Wn. App. 576, 24 P.3d 1074, review denied, 145 Wn.2d 1006 (2001). Capello was convicted of a sex offense and sentenced under the 1995 version of the Act. In 1995, only the sentencing court had authority to impose conditions of community custody. The statute under which Capello was sentenced, former RCW 9.94A.120 (1995), permitted but did not require the court to order him to obtain the Department's preapproval of his proposed residence location and living arrangements before he transferred to community custody. Capello, 106 Wn. App. at 581. The Department asked the court to include the preapproval condition in Capello's sentence, but the court declined to do so. Capello, 106 Wn. App. at 579. Nevertheless, when Capello became eligible for transfer to community custody, the Department insisted that he obtain preapproval. Capello, 106 Wn. App. at 579.

The matter came before this court when Capello filed a personal restraint petition. The Department claimed that it was authorized to impose the preapproval condition as part of its statutory authority to develop an eligibility program for community custody. This court rejected the Department's argument,

3

holding that preapproval was a condition that only the trial court had authority to impose:

> Former RCW 9.94A.120(8)(c) provides that "the court" may order "special" conditions of community placement. One of those special conditions was preapproval of living arrangements. The SRA defines community custody as a form of community placement. And under former RCW 9.94A.120, the trial court had the authority to impose conditions of community placement. There is nothing in the SRA specifically authorizing DOC to independently impose any of the statutorily listed special conditions of community placement. While the definition of "community custody" acknowledges that an offender is subject to DOC control during that period, it would be inconsistent with RCW 9.94A.120 to interpret this as a grant of independent authority to impose a special condition which the trial court specifically declined to impose. . . . The statutory framework of RCW 9.94A.120 evinces a legislative intent that the trial court, not DOC, has exclusive discretion to decide whether or not to waive the standard conditions enumerated in RCW 9.94A.120(8)(b), and whether or not to impose the special conditions enumerated in RCW 9.94A.120(8)(c).

Capello, 106 Wn. App. at 583-84 (footnotes omitted).

McClinton argues that GPS monitoring, like preapproval, is a condition of community custody that the Department lacks statutory authority to impose.[1] "Just as the law in Capello's instance did not authorize the department to impose additional conditions of community placement, the law in McClinton's instance likewise did not authorize the department to impose additional conditions." Br. of Appellant at 19.

A requirement to submit to GPS monitoring is not analogous to the preapproval condition in Capello. The 1995 version of RCW 9.94A.120 does not

---

[1] A statute enacted in 1996, and therefore not applicable here, does give the Department explicit authority to impose additional conditions of community custody on sex offenders. RCW 9.94A.120 (1996). See Capello, 106 Wn. App. at 584-85 (discussing how the 1996 amendments changed the law).

4

itemize monitoring as either a mandatory or optional condition of community custody.[2] So, unlike in Capello, there is no statutory basis for McClinton's argument that submission to monitoring is a condition of community custody that only a trial court may impose.

Distinguishing Capello does not, however, answer McClinton's basic contention that the Department lacks authority to order him to wear a GPS tracking device. For sex offenders sentenced more recently, the Department

---

[2] The statute as it existed in 1995 sets forth a number of mandatory conditions of community custody for a court to include in the sentence and some optional conditions.

(b) . . . Unless a condition is waived by the court, the terms of community placement for offenders sentenced pursuant to this section shall include the following conditions:

(i) The offender shall report to and be available for contact with the assigned community corrections officer as directed;

(ii) The offender shall work at department of corrections-approved education, employment, and/or community service;

(iii) The offender shall not consume controlled substances except pursuant to lawfully issued prescriptions;

(iv) An offender in community custody shall not unlawfully possess controlled substances;

(v) The offender shall pay supervision fees as determined by the department of corrections; and

(vi) The residence location and living arrangements are subject to the prior approval of the department of corrections during the period of community placement.

(c) The court may also order any of the following special conditions:

(i) The offender shall remain within, or outside of, a specified geographical boundary;

(ii) The offender shall not have direct or indirect contact with the victim of the crime or a specified class of individuals;

(iii) The offender shall participate in crime-related treatment or counseling services;

(iv) The offender shall not consume alcohol; or

(v) The offender shall comply with any crime-related prohibitions.

Former RCW 9.94A.120(9)(b)-(c) (1995).

does have express authority to use GPS monitoring if it is appropriate to the offender's individual circumstances:

> (5) If the offender was sentenced pursuant to a conviction for a sex offense, the department may:
>
> . . . .
>
> (b) Impose electronic monitoring. Within the resources made available by the department for this purpose, the department shall carry out any electronic monitoring using the most appropriate technology given the individual circumstances of the offender. As used in this section, "electronic monitoring" means the monitoring of an offender using an electronic offender tracking system including, but not limited to, a system using radio frequency or active or passive global positioning system technology.

RCW 9.94A.704(5)(b); see LAWS OF 2008, ch. 231, § 10. But this express authority was supplied by an amendment enacted in 2008. McClinton argues that the only possible interpretation of the 2008 amendment is that it confers new authority upon the Department that did not exist in 1995.

Where there has been doubt or ambiguity about the meaning of a statute, an amendment by the Legislature may be interpreted as intended to clarify existing law rather than change it. State v. Riles, 135 Wn.2d 326, 343, 957 P.2d 655 (1998), abrogated on other grounds by State v. Valencia, 169 Wn.2d 782, 239 P.3d 1059 (2010). In its brief in this case, the State initially argued that the 2008 amendment did not change the law but only clarified it to erase any doubt about the Department's authority to impose GPS monitoring on sex offenders. At oral argument before this court, however, the State tacked away from the 2008 amendment and instead homed in on a 1997 amendment interpreted in Riles as the source of the Department's authority.

6

In <u>Riles</u>, the defendants argued that a trial court exceeded its authority by requiring a sex offender, as a condition of sentence, to submit to polygraph testing. The defendants in <u>Riles</u> were subject to a pre-1997 version of the statute. Although the pre-1997 statute did not specifically permit or require testing of any sort, the Supreme Court construed it as authorizing the use of polygraph tests to monitor compliance with sentencing conditions. The 1997 amendment was key to the court's analysis. The 1997 amendment added new language providing that for a sex offense committed on or after July 1, 1990, but before June 6, 1996, it was mandatory to include among the conditions of community custody that the offender "submit to affirmative acts necessary to monitor compliance with the orders of the court as required by the department." Former RCW 9.94A.120(9)(b)(vi) (1997); LAWS OF 1997, ch.144, § 1. The court found the 1997 enactment did not change the law. Despite its new language, the 1997 amendment did not provide authority that was previously lacking; rather, it clarified that at least since 1990, the relevant statutes required monitoring of sex offenders for compliance with sentence conditions.

> In 1997, the Legislature amended RCW 9.94A.030 and 9.94A.120. The title to the amendment reads "AN ACT Relating to assuring compliance with sentence conditions; and reenacting and amending RCW 9.94A.030 and 9.94A.120." In two provisions, RCW 9.94A.030(11) and 9.94A.120(14), new language was added which authorizes a court to order affirmative acts necessary to monitor compliance with sentencing conditions. Another subsection, (vi), was added to RCW 9.94A.120(9)(b) making mandatory the affirmative acts necessary to monitor compliance with orders of the court. These amendments suggest the Legislature intended to confirm the practice of allowing testing, such as polygraphs, for monitoring compliance with sentencing conditions. Where there has been doubt or ambiguity surrounding a statute, amendment by the Legislature is interpreted as some

7

indication of legislative intent to clarify, rather than to change, existing law. A subsequent amendment can be further indication of the statute's original meaning where the original enactment was "ambiguous to the point that it generated dispute as to what the Legislature intended." One can conclude from these amendments that the Legislature intended to clarify and interpret the statute to resolve any dispute concerning its actual meaning.[56]

---

[56] See 1997 FINAL LEGISLATIVE REPORT, S.B. 5519, 55th Legis., Reg. Sess.:

> **Summary**: The department is authorized to require an offender to perform affirmative acts, such as drug or polygraph tests, necessary to monitor compliance with crime-related prohibitions and other sentence conditions.

Riles, 135 Wn.2d at 342-43 (some footnotes omitted).

We agree with the State's revised argument. The above passage in Riles is dispositive on the issue of the Department's authority to use monitoring tools in supervising McClinton. Therefore, it is unnecessary to determine whether such authority can be deduced from the 2008 amendment. Because McClinton committed his crimes in 1995 (between July 1, 1990, and June 6, 1996), under Riles, he is subject to the 1997 clarifying amendment. He must "submit to affirmative acts necessary to monitor compliance with the orders of the court as required by the department."

Our conclusion that pre-1995 statutes authorized the Department to require McClinton to submit to monitoring tools is further supported by a statute that explicitly assigns the responsibility of "monitoring" sentence conditions to the Department's community corrections officers:

> "Community corrections officer" means an employee of the department who is responsible for carrying out specific duties in supervision of sentenced offenders and monitoring of sentence conditions.

Former RCW 9.94A.030(3) (1995). If there were no way to monitor an offender's compliance with the conditions of community custody, the imposition of such conditions would be meaningless. See Riles, 135 Wn.2d at 341.

In addition, McClinton's sentence requires him to "report to and be available for contact with the assigned community corrections officer as directed." Clerk's Papers at 17; see former RCW 9.94A.120(9)(b)(i) (1995). This requirement is consistent with the statute that defines the Department's supervisory role and requires the offender to "follow explicitly" the Department's instructions:

> All offenders sentenced to terms involving community supervision, community service, community placement, or legal financial obligation shall be under the supervision of the secretary of the department of corrections or such person as the secretary may designate and shall follow explicitly the instructions of the secretary including reporting as directed to a community corrections officer, remaining within prescribed geographical boundaries, notifying the community corrections officer of any change in the offender's address or employment, and paying the supervision fee assessment.

Former RCW 9.94A.120(13) (1995).

The Department's instructions that must be explicitly followed include "remaining within prescribed geographical boundaries." It is undisputed that in sentencing McClinton, the court could require him to "remain within, or outside of, a specified geographical boundary" as a condition of community custody. Former RCW 9.94A.120(9)(c)(i) (1995). McClinton contends the court did not prescribe any geographical boundaries. We disagree. Of the 17 conditions of community custody that were imposed upon McClinton by the sentencing court,

9

at least 2 can be enforced by instructions from the Department to remain within prescribed geographical boundaries:

> 12. Do not attend X-rated movies, peep shows or adult book stores without the approval of the sexual deviancy treatment specialist or Community Corrections Officer.
>
> . . . .
>
> 15. Do not enter any business where alcohol is the primary commodity for sale.

A GPS device can be useful to a community corrections officer who has the duty to monitor McClinton's compliance with these geographical limitations.

The 1995 statutes not only generally authorize the Department to require a sex offender to submit to the use of monitoring tools, they specifically contemplate the use of electronic monitoring:

> The department may require offenders to pay for special services rendered on or after July 25, 1993, including electronic monitoring, day reporting, and telephone reporting, dependent upon the offender's ability to pay. The department may pay for these services for offenders who are not able to pay.

Former RCW 9.94A.120(13) (1995). GPS tracking is a form of electronic monitoring.

In summary, the statutes discussed above authorize the Department to require McClinton to submit to GPS tracking if it is necessary to monitor his compliance with the geographical limitations imposed by the court as conditions of community custody. Because the community corrections officers assigned to supervise McClinton had the authority to instruct him to submit to GPS monitoring, the court properly sanctioned him for refusal to do so.

A second issue raised by McClinton is whether there was insufficient proof to support the court's decision to sanction him for failing to provide a current

address. Again, as he has already served the sanction, the issue is moot. Unlike the issue of GPS monitoring, this claim is unlikely to recur and there is no need for an authoritative determination to guide public officers in the future. Therefore, we decline to address it.

Affirmed.

Becker, J.

WE CONCUR: