IN THE COURT OF APPEALS OF THE STATE OF WASHINGTON

DIVISION II

| | |
|---|---|
| M. GWYN MYLES, individually and as Personal Representative of the Estate of WILLIAM LOYD MILES, deceased,<br><br>Respondent,<br><br>v.<br><br>STATE OF WASHINGTON, a governmental entity; JOHN DOE EMPLOYEE(S) and JANE DOE EMPLOYEE(S), employees of the State of Washington,<br><br>Appellants,<br><br>CLARK COUNTY, a municipality; JOHN DOE EMPLOYEE(S) and JANE DOE EMPLOYEE(S), employees of Clark County; CARLOS VILLANUEVA-VILLA and JANE DOE VILLANUEVA-VILLA, husband and wife, and the marital community composed thereof; and R.H. BRUSSEAU and JANE DOE BRUSSEAU, husband and wife, and the marital community composed thereof,<br><br>Defendants. | No. 49928-2-II<br><br><br>UNPUBLISHED OPINION |

JOHANSON, J. — M. Gwyn Myles, individually and as the personal representative of her

husband William Myles's estate, sued the Washington State Department of Corrections (DOC) for

the wrongful death of her husband, William Myles, in a vehicle accident caused by Carlos

Villanueva-Villa in January 2006. Myles alleged that the DOC's negligent supervision of Villanueva-Villa led to her husband's death. The superior court denied the DOC's summary judgment motion. We granted the DOC's motion for discretionary review.[1]

Because the DOC lacked the authority (1) to supervise Villanueva-Villa on his felony conviction under former RCW 9.94A.501 (2003), (2) to toll Villanueva-Villa's misdemeanor probation, and (3) to supervise him on his misdemeanor conviction after May 10, 2005 under former RCW 9.94A.501 (2005), Myles fails to establish that the DOC had a duty to prevent Villanueva-Villa from harming William Myles.[2] Accordingly, we reverse the superior court's order denying the DOC's motion for summary judgment and remand for the superior court to dismiss the DOC from this case.

FACTS

I. BACKGROUND

A. 2003 CONVICTIONS AND SENTENCES

In April 2003, nearly three years before Villanueva-Villa was involved in an accident that caused William Myles's death, Villanueva-Villa pleaded guilty to misdemeanor second degree vehicle prowling and felony bail jumping.[3] The superior court sentenced him on April 14, 2003.

---

[1] *See* Ruling Granting Review, *Myles v. State*, No. 49928-2-II (Wash. Ct. App. June 20, 2017).

[2] The DOC also argues that there was no question of fact as to proximate cause. Because we hold that there was no duty, we do not address proximate cause.

[3] Villanueva-Villa committed the misdemeanor offense on August 8, 2001, and the felony offense on April 1, 2002.

On the felony conviction, the superior court imposed a sentence of 61 days in custody, with credit for 61 days served, and 12 months of community custody under DOC supervision. Among other conditions, Villanueva-Villa's community custody for the felony conviction required him to not violate any laws and to notify his community corrections officer (CCO) of any change in address. The superior court also imposed legal financial obligations (LFOs).

On the misdemeanor conviction, the superior court imposed a sentence of 365 days in jail, with credit for 61 days and 304 days suspended, and 12 months of probation supervised by the DOC. The conditions of his misdemeanor probation required him to report regularly, to not violate any laws, to notify the DOC within 48 hours of any arrest or citation, and to obtain permission to move.

## B. POST-SENTENCE ACTIVITY AND STATUTORY CHANGES

### 1. 2003

At his May 5, 2003 DOC intake, the DOC classified Villanueva-Villa "as an 'RM-D' offender." Clerk's Papers (CP) at 46, 257. RM-D offenders are at the lowest risk to reoffend. Villanueva-Villa also successfully reported at a reporting kiosk.

On May 21, DOC's mail to Villanueva-Villa was returned as undeliverable. On June 17, the DOC attempted a "skip trace" and contacted Villanueva-Villa's brother, who informed them Villanueva-Villa was in the process of moving. CP at 257 (capitalization omitted).

On July 1, former RCW 9.94A.501 (2003) came into effect. LAWS OF 2003, ch. 379, § 3. This statute limited the DOC's authority to supervise felony offenders to *only* those offenders who (1) were assessed "in one of the two highest risk categories," (2) had current or prior convictions for one of several enumerated offenses, (3) were subject to chemical dependency treatment as a

condition of community custody, placement, or supervision, (4) were sentenced under a first-time offender waiver or special sex offender sentencing alternative, or (5) were subject to supervision under the interstate compact for adult offender supervision (RCW 9.94A.745). Former RCW 9.94A.501(2), (3) (2003). Villanueva-Villa did not qualify for supervision under any of these categories.

On November 18, the DOC again attempted to contact Villanueva-Villa about his LFOs by mail and the mail was returned. On December 29, prompted by Villanueva-Villa's failure to notify the DOC that his address had changed, Villanueva-Villa's CCO filed a violation notice related to the misdemeanor sentence and informed Villanueva-Villa that "any violations will be addressed by the Court on the misdemeanor portion" of his case.[4] CP at 338. The violation notice also stated that the misdemeanor sentence would expire April 13, 2004, after which the DOC would "no longer have an interest in this Cause." CP at 339. The DOC recommended a sanction of 10 days incarceration for each of the three violations, to be served consecutively. It also noted a violation hearing for March 4, 2004.

2. 2004

In late January 2004, the DOC again tried to contact Villanueva-Villa by mail and the mail was returned as undeliverable. When Villanueva-Villa failed to appear for the March 4 violation hearing, the superior court issued a bench warrant.

On April 29, the DOC closed supervision on the felony sentence because Villanueva-Villa did "not meet the criteria for continued supervision by the [DOC]" under former RCW 9.94A.501

---

[4] These violations included (1) failure to report an address change, (2) failure to pay LFOs, and (3) failure to pay the costs of supervision.

(2003). CP at 342. On April 30, the DOC closed supervision on the misdemeanor sentence because that sentence expired on April 13, 2004, and the DOC determined that the existence of the warrant did not toll the closure of the misdemeanor supervision. These closure reports were filed with the superior court on May 6.

On May 24, the Clark County Prosecutor filed a motion for an order modifying or revoking "the Judgment and Sentence previously imposed" on the misdemeanor and felony offenses.[5] CP at 347. The prosecutor also requested a bench warrant for Villanueva-Villa's arrest. That same day, the superior court issued a bench warrant to secure Villanueva-Villa's presence for a hearing on the State's motion to modify or revoke the felony and misdemeanor sentences.

According to the DOC's chronology notes, on July 30, the DOC reopened supervision of the felony sentence and requested a "Secretary's warrant," apparently because the DOC believed that the felony supervision had been tolled while Villanueva-Villa was not reporting.[6] CP at 48. The DOC alleged that Villanueva-Villa had failed to report a change of address in January 2004 and had failed to pay LFOs. The DOC recommended that Villanueva-Villa be required to report "by kiosk" for 30 days and serve 30 days on a state work crew. CP at 241. A "secretary's warrant" was entered August 3.

---

[5] The prosecutor's motion listed four violations that occurred between April 14, 2003 and March 4, 2004: (1) failure to provide a change of address, (2) failure to pay LFOs, (3) failure to pay cost of supervision, and (4) failure to appear at the March 4, 2004 hearing.

[6] In his declaration supporting the DOC's motion for summary judgment, Robert Story, a former community corrections supervisor for the DOC who had worked with Villanueva-Villa's case, opined that this rescission was in error and that the DOC lost the authority to supervise Villanueva-Villa on July 1, 2003, when former RCW 9.94A.501 (2003) became effective.

On August 12, the DOC filed a report in Clark County Superior Court on Villanueva-Villa's felony conviction.[7] In this report, the DOC requested that supervision be reopened, apparently because the DOC failed to toll Villanueva-Villa's felony supervision due to his abscond status.

3.      2005

In 2005, the legislature amended the criteria for DOC supervision, former RCW 9.94A.501 (2003), to include misdemeanors. LAWS OF 2005, ch. 362, § 1. The 2005 amendment took effect May 10, 2005. LAWS OF 2005, ch. 362, § 5.

On October 10, 2005, Villanueva-Villa was arrested for driving a vehicle with expired tags and without insurance and was held on the outstanding warrants. On October 11, the superior court issued an order modifying Villanueva-Villa's sentence, which imposed a 30-day sanction.[8] The order did not specify whether it was addressing the felony or the misdemeanor, but the memorandum of disposition issued the same day lists only the felony conviction. The DOC noted in its chronology that Villanueva-Villa's sentence had been tolled from November 18, 2003 (the date the DOC's second letter to Villanueva-Villa was returned) through October 10, 2005 (the date of his arrest).

The DOC held a negotiated sanction hearing with Villanueva-Villa on October 20. On October 21, the negotiated sanction requiring Villanueva-Villa to report to the DOC for 30 days

---

[7] It is not clear why the DOC's chronology notes state that the DOC had reopened supervision on July 30, but the report was not filed in the superior court until August 12.

[8] The order lists four violations: (1) failing to provide a change of address between May 21, 2003 and November 18, 2003, (2) failing to pay LFOs, (3) failing to pay the cost of supervision, and (4) failing to appear for the March 4, 2004 hearing.

and to provide a valid address immediately was entered in the superior court. The negotiated sanction form noted that the supervision on the felony offense would end March 5, 2006 due to tolling. The negotiated sanction form lists only the felony offense.

Villanueva-Villa was released on bail on October 21, and reported to the DOC as directed. From October 21 until the end of December, he substantially complied with the negotiated sanctions, although he occasionally missed a day of reporting. The DOC advised Villanueva-Villa that he would not get reporting credit for the days he missed. During this reporting period, Villanueva-Villa also failed to advise the DOC before he moved.

Meanwhile, on November 26, Villanueva-Villa was arrested for driving under the influence (DUI) in Clark County. When he failed to appear for the December 5 hearing on this matter, an arrest warrant was issued. But on December 6, unaware of the November 26 DUI, the DOC completed a "review checklist" and noted that Villanueva-Villa was in compliance with his conditions and that he had not committed any new law violations. CP at 259 (capitalization omitted).

On December 23, Villanueva-Villa was arrested for a second DUI in Clark County. When he failed to appear for the December 29 hearing on this matter, another arrest warrant was issued.

4.      2006

Villanueva-Villa did not report to the DOC the week ending January 6, 2006. When the DOC attempted to contact him on January 8, his roommate said that Villanueva-Villa had moved.

On January 13, the DOC requested a warrant because Villanueva-Villa had failed to report a change of address and had failed to report daily. This led to a file review of Villanueva-Villa's case, and the DOC determined that Villanueva-Villa's supervision for the felony should have been

7

closed July 1, 2003, the effective date of former RCW 9.94A.501 (2003). Once this was discovered, the DOC requested that the warrant request be cancelled and terminated DOC supervision as of January 13.

On January 27, 2006, Villanueva-Villa caused the accident that killed William Myles. Following this accident, Villanueva-Villa was again cited for driving under the influence, and the State charged him with vehicular homicide. Villanueva-Villa pleaded guilty to vehicular homicide and hit and run (death).

## II. PROCEDURE

On January 20, 2009, Myles filed a wrongful death action against the DOC and other defendants. Myles alleged that the DOC's negligence in failing to adequately monitor or supervise Villanueva-Villa while he was on "community custody" led to William Myles's death. CP at 19.

The DOC moved for summary judgment. The DOC argued that it did not owe a duty to William Myles or to his estate and that Myles had failed to establish proximate cause. In support of its summary judgment motion, the DOC presented a declaration from former community corrections supervisor Story.

Story stated that Villanueva-Villa had been classified as an RM-D offender, the lowest risk level the DOC assigned. According to Story, the "[s]upervision of 'RM-D' offenders was essentially administrative supervision to monitor whether or not the offender was current in payments on [legal financial obligations (LFOs)]." CP at 43.

Story also stated that from 2003 to 2006, the "DOC did not receive reports from law enforcement agencies for contact that 'RM-D' offenders may have had with law enforcement." CP at 43. Thus, the DOC did not have knowledge of any new offenses unless the new crime was

discovered during the quarterly reviews that occurred before the scheduled closure date or the offender self-reported contact with law enforcement.

Myles responded to the DOC's summary judgment motion. Myles asserted that (1) the DOC had the authority to supervise Villanueva-Villa on the misdemeanor conviction until May 10, 2005 due to tolling and because the negotiated sanction agreement created a special relationship between the DOC and Villanueva-Villa and (2) DOC still had the responsibility to report violations even if it was not "'actively'" monitoring Villanueva-Villa. CP at 294. Nothing in Myles's response contradicted Story's affidavit.

The trial court denied the DOC's motion for summary judgment.

The DOC moved for discretionary review of the order denying summary judgment. We accepted discretionary review. *See* Ruling Granting Review, *Myles v. State*, No. 49928-2-II (Wash. Ct. App. June 20, 2017).

ANALYSIS

The DOC argues that Myles did not establish that the DOC had a duty to prevent Villanueva-Villa from harming William Myles under the special relationship doctrine because Myles failed to show that the DOC had a take-charge relationship with Villanueva-Villa. Specifically, the DOC argues that there was no take-charge relationship because (1) the DOC had no authority to supervise Villanueva-Villa on the felony conviction after July 1, 2003, the effective date of former RCW 9.94A.501 (2003), (2) the DOC's ability to supervise Villanueva-Villa on the misdemeanor conviction ended when the one-year probationary period expired on April 13, 2004 and was not subject to tolling by the DOC, and (3) the DOC had no authority to supervise

Villanueva-Villa on the misdemeanor conviction after May 10, 2005 under former RCW 9.94A.501 (2005). We agree.

## I. GENERAL LEGAL PRINCIPLES

We review summary judgment orders de novo, performing the same inquiry as the superior court. *Vallandigham v. Clover Park Sch. Dist. No. 400*, 154 Wn.2d 16, 26, 109 P.3d 805 (2005). "Summary judgment is appropriate if 'the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law.'" *Vallandingham*, 154 Wn.2d at 26 (quoting CR 56(c)). When reviewing a summary judgment, we consider all facts and reasonable inferences from them in the light most favorable to the nonmoving party. *Vallandingham*, 154 Wn.2d at 26.

To establish the elements of negligence, Myles must show (1) the existence of a duty, (2) breach of that duty, (3) a resulting injury, and (4) causation. *Couch v. Dep't of Corr.*, 113 Wn. App. 556, 563, 54 P.3d 197 (2002). Whether a legal duty exists is a question of law. *Hertog v. City of Seattle*, 138 Wn.2d 265, 275, 979 P.2d 400 (1999).

## II. SPECIAL RELATIONSHIP DOCTRINE AND TAKE-CHARGE RELATIONSHIP

"In general, an actor 'has no duty to prevent a third person from causing physical injury to another.'" *Couch*, 113 Wn. App. at 564 (quoting *Taggart v. State*, 118 Wn.2d 195, 218, 822 P.2d 243 (1992)). One exception to this rule is when there is "'a special relationship' between the actor and the third person.'" *Couch*, 113 Wn. App. at 564 (quoting *Taggart*, 118 Wn.2d at 218). "Such a relationship must be 'definite, established[,] and continuing,' but it need not be custodial." *Couch*, 113 Wn. App. at 564 (quoting *Hertog*, 138 Wn.2d at 276-77, 288; citing *Bishop v. Miche*,

137 Wn.2d 518, 524, 973 P.2d 465 (1999); *Taggart*, 118 Wn.2d at 219; *Honcoop v. State*, 111 Wn.2d 182, 193, 759 P.2d 1188 (1988)).

One form of special relationship that can result in a duty is a "take-charge" relationship between a parole officer and a parolee. *Taggart*, 118 Wn.2d at 218-20. In *Joyce v. Department of Corrections*, 155 Wn.2d 306, 315-16, 119 P.3d 825 (2005), our Supreme Court extended the special relationship doctrine to CCOs who have a take-charge relationship with a convicted person.

> To determine whether a supervising officer has "taken charge" of [a convicted person] within the meaning of *Taggart* and Restatement [of Torts] §§ 315 and 319, a court must examine "the nature of the relationship" between the officer and that person, including all of that relationship's "[v]arious features[.]" In most cases, *two of the most important features,* though not necessarily the only ones, *will be the court order that put the [convicted person] on the supervising officer's caseload and the statutes that describe and circumscribe the officer's power to act. A community corrections officer must have a court order before he or she can "take charge" of [a convicted person]; and even when he or she has such an order, he or she can only enforce it according to its terms and applicable statutes.*

*Couch*, 113 Wn. App. at 565 (some alterations in original) (footnotes omitted) (emphasis added) (quoting *Bishop*, 137 Wn.2d at 527; *Taggart*, 118 Wn.2d at 219).

### III. FELONY SUPERVISION

The DOC contends that after July 1, 2003, just two months after Villanueva-Villa's initial intake and two and a half years before William Myles's death, it could not have formed a take-charge relationship with Villanueva-Villa based on the felony conviction because under former RCW 9.94A.501 (2003), the DOC lacked the authority to supervise Villanueva-Villa. We agree.

Former RCW 9.94A.501 (2003), which took effect July 1, 2003, required the DOC to perform a risk assessment of the felony offender and to "classify the offender into one of at least four risk categories." Former RCW 9.94A.501(1) (2003). It further required the DOC to supervise

a felony offender sentenced to terms of community custody if the offender's risk assessment was

in one of the two highest risk categories, or, regardless of the offender's risk category, if

> (1) the offender had a current or prior conviction for a sex offense, a violent offense, a crime against a person, a felony domestic violence offense, residential burglary, or one of several drug offenses;
> (2) the offender's community custody included chemical dependency treatment;
> (3) the offender was sentenced under a first-time offender waiver or a special sex offender sentencing alterative; or
> (4) the offender was subject to supervision under the interstate compact for adult offender supervision.

Former RCW 9.94A.501(2) (2003).  But most importantly for this case, former RCW 9.94A.501(3)

(2003) provided that "[t]he [DOC] is not authorized to, and may not, supervise any offender

sentenced to a term of community custody, community placement, or community supervision

unless the offender is one for whom supervision is required under subsection (2) of this section."

In May 2003, the DOC determined that Villanueva-Villa's risk classification was RM-D,

the lowest risk to reoffend.  And Villanueva-Villa did not fall under any of the categories

specifically enumerated in former RCW 9.94A.501(2) (2003).  Thus, after July 1, 2003, former

RCW 9.94A.501(3) (2003) expressly precluded the DOC from supervising Villanueva-Villa on

his felony conviction.

As we acknowledged in *Couch*, among the "most important features" establishing a take-

charge relationship are "the statutes that describe and circumscribe the [supervising] officer's

power to act."  113 Wn. App. at 565.  Even if there is a court order placing a defendant on the

supervisor's case load, the CCO "can only enforce [the order] according to [the order's] terms and

applicable statutes."  *Couch*, 113 Wn. App. at 565; *see also Terrell C. v. Dep't of Soc. & Health*

*Servs.*, 120 Wn. App. 20, 28, 84 P.3d 899 (2004) ("[I]n cases where there is no underlying statutory

authority to control or [to] take charge of the offender's behavior, no special relationship has been imposed."). Thus, after July 1, 2003, two and a half years before the accident that killed William Myles, the DOC had no authority to control Villanueva-Villa and, therefore, no take-charge relationship with respect to Villanueva-Villa under the felony conviction. Because Myles does not establish a take-charge relationship, Myles cannot establish that the DOC had a duty to prevent Villanueva-Villa from harming William Myles based on a failure to supervise Villanueva-Villa on his felony conviction.[9]

Myles argues that under RCW 9.94A.345, former RCW 9.94A.501 (2003) does not apply because the superior court must apply the sentencing statutes in effect at the time of the crime. We disagree.

RCW 9.94A.345 provides that defendants must be sentenced under the law in effect at the time the crime was committed. According to the statutory note accompanying RCW 9.94A.345, the legislature intended RCW 9.94A.345 to cure any ambiguity as to what law to use when calculating a convicted defendant's offender score for purposes of sentencing and "to clarify the

---

[9] Myles asserts that "[i]f it was the intent of the legislature to make conditions of an offender's sentence contingent upon DOC's risk assessment findings, the statute would specifically state such contingency -- but it does not." Resp't's Opening Br. at 17. But that is precisely what former RCW 9.94A.501 (2003) states in relation to the DOC's role in supervising a felony offender's community custody. Former RCW 9.94A.501 (2003) did not, however, eliminate the court's ability to enforce sentencing conditions.

Myles also appears to assert that because the legislature failed to pass a prior bill that would have allowed the DOC to "eliminate" or "terminate" community custody in 2002, the elimination or termination of community custody was not the legislature's intent in 2003. Resp't's Opening Br. at 18. But whether the legislature passed a different bill a year earlier is irrelevant. Also, the 2003 amendment did not allow the DOC to *eliminate* or *terminate* community custody, it just limited the DOC's ability to enforce community custody from 2003 until the statute expired in 2010. Even if the DOC could not enforce community custody, the superior court could.

applicability of statutes creating new sentencing alternatives or modifying the availability of existing alternatives." LAWS OF 2000, ch. 26, § 1. RCW 9.94A.345 was not intended to limit the legislature's ability to define the scope of the DOC's authority. Additionally, former RCW 9.94A.510 (2003) did not prevent the superior court from *sentencing* Villanueva-Villa under the statutes in effect when the crimes were committed, it merely determined who had the authority to enforce the sentence.

Myles further argues that *State v. McClinton*, 186 Wn. App. 826, 347 P.3d 889 (2015), and *State v. Medina*, 180 Wn.2d 282, 324 P.3d 682 (2014), demonstrate that former RCW 9.94A.501 (2003) does not apply to sentences imposed before July 1, 2003. But these cases are not persuasive.

*McClinton* addressed whether the DOC could "use GPS (global positioning system) monitoring to keep track of a sex offender who [was] serving the community portion of a sentence" when the statutes in effect at the time of the offense "did not specifically provide the [DOC] with authority to use GPS monitoring." *McClinton*, 186 Wn. App. at 828. Division One of this court recognized that "[t]he terms of a defendant's sentence are governed by the version of the Sentencing Reform Act [of 1981, ch. 9.94A RCW] in effect when the crime was committed." *McClinton*, 186 Wn. App. at 829. But *McClinton* addressed whether the DOC had the authority to use a new method of monitoring the offender that was not statutorily authorized rather than the DOC's authority to enforce community custody conditions generally. Unlike here, where the change in the law related only to the DOC's enforcement authority, requiring the offender to wear a new monitoring system not expressly authorized changed the nature of the punishment imposed.

In *Medina*, our Supreme Court addressed whether an offender should receive credit for time served in programs that he participated in as a condition of release after his original conviction

was vacated but before he was reconvicted. 180 Wn.2d at 284-87. After stating that a "defendant must be sentenced in accordance with the law in effect at the time of his or her offense," the court examined the law in effect at the time of the offense to determine if Medina was entitled to credit for time served. *Medina*, 180 Wn.2d at 287. Again, *Medina* addressed a matter that related to the severity of the punishment because it could increase or decrease the offender's time in custody, rather than the DOC's general authority to enforce community custody conditions.

Myles asserts that the final bill report for engrossed substitute senate bill 5990, the bill that enacted former RCW 9.94A.501 (2003), establishes that the DOC had some remaining active supervisory duty of Villanueva-Villa. *Final B. Rep. on Engrossed Substitute S.B. 5990*, 58th Leg., Reg. Sess. (Wash. 2003). As Myles notes, the bill report states that offenders with low risk classifications "are actively supervised only if a violation of a release condition is brought to the attention of the [DOC]." FINAL B. REPORT, *supra*, at 2. But that section of the bill report describes the *background* of the bill—in other words, what the statute formerly required—not what the amended statute required. FINAL B. REPORT, *supra*, at 2. In fact, the bill report expressly states that under former RCW 9.94A.501 (2003), the DOC did *not* have the authority to actively supervise someone unless that person fell into the specific categories described in the statute. FINAL B. REPORT, *supra*, at 2-3. Thus, the bill report does not support the conclusion that the DOC had an active supervisory duty after the 2003 amendment. Accordingly, this argument is not persuasive.

Finally, Myles also asserts that the felony conditions should have been tolled. Even if the conditions should have been tolled, the DOC lacked the authority to enforce them after July 1, 2003 under former RCW 9.94A.501(3) (2003).

Because the DOC did not have the authority to supervise Villanueva-Villa on his felony conviction after July 1, 2003, Myles fails to establish that the DOC had a take-charge relationship with Villanueva-Villa under the felony sentence. Thus, Myles fails to establish that the DOC had a duty under the felony sentence to prevent Villanueva-Villa from harming William Myles.

## IV. MISDEMEANOR PROBATION

We next turn to whether Myles has established that the DOC had a duty to prevent Villanueva-Villa from harming William Myles under the misdemeanor conviction. The DOC argues that it did not have any duty under the misdemeanor conviction because (1) its authority expired on April 14, 2004, when Villanueva-Villa's one-year probationary supervision ended and the DOC had no authority to toll the probationary period, and (2) it had no authority to supervise Villanueva-Villa after May 10, 2005, under former RCW 9.94A.501(3) (2005). We agree.

## A. NO TOLLING

When Villanueva-Villa's misdemeanor probation period ended on April 13, 2004, DOC policy prohibited the DOC from tolling misdemeanor supervision unless specifically ordered by the trial court. DOC Policy 320.160.[10] Although there was statutory authority permitting the DOC to toll felony supervision,[11] the statutes addressing misdemeanor probation did not give the DOC the authority to toll a misdemeanor probation period. Instead, RCW 9.95.230 provided that *the*

---

[10] *Available at* http://www.doc.wa.gov/information/policies/defaults.aspx?show=300.

[11] *See* former RCW 9.94A.545 (2003). Former RCW 9.94A.545 (2003) applied only to "offenders," which at that time included those convicted of only felony offenses. Former RCW 9.94A.030(30) (2002). The definition of "offender" was not amended to include misdemeanor or gross misdemeanor probationers until 2009. LAWS OF 2009, ch. 375, § 4.

*court* had the authority any time before the entry of an order terminating probation to modify an order suspending the defendant's sentence.

Because the DOC did not have the authority to toll Villanueva-Villa's misdemeanor probation, its relationship with Villanueva-Villa based on the misdemeanor conviction ended on April 13, 2004, barring any extension by the superior court.[12]  Without any authority over Villanueva-Villa, there was no "'definite, established[,] and continuing,'" relationship between the DOC and Villanueva-Villa, and therefore no "'special relationship'" based on the misdemeanor conviction that resulted in any duty to protect William Myles.[13]  *Couch*, 113 Wn. App. at 564 (quoting *Hertog*, 138 Wn.2d at 276, 288).

---

[12] To the extent Myles is arguing that the DOC's failure to supervise Villanueva-Villa *before* April 13, 2004, was negligent, we note that the DOC reported Villanueva-Villa's pre-April 13, 2004 violations to the superior court and a bench warrant was issued for Villanueva-Villa's arrest before the DOC closed the misdemeanor case.  The issuance of the warrant terminated any special relationship that may have resulted under the misdemeanor conviction up to that point. *See Smith v. Dep't of Corr.*, 189 Wn. App. 839, 849, 359 P.3d 867 (2015) (special relationship between the DOC and defendant terminates after the defendant has absconded and an arrest warrant was issued), *review denied*, 185 Wn.2d 1004 (2016).

[13] Myles also argues that even if there was no statutory authority allowing the DOC to toll a misdemeanor probation sentence, common law allows for tolling.  But Myles does not direct us to any cases that allow *the DOC* to toll a misdemeanor probation sentence—the cases he cites all address *the court's* tolling authority.  *See City of Spokane v. Marquette*, 146 Wn.2d 124, 134, 43 P.3d 502 (2002) (examining tolling of suspended sentence by municipal court); *State v. V.J.*, 132 Wn. App. 380, 384, 132 P.3d 763 (2006) (examining tolling of community supervision by juvenile court); *State v. Haugen*, 22 Wn. App. 785, 787-88, 591 P.2d 1218 (1979) (examining tolling of probation by trial court); *State v. Frazier*, 20 Wn. App. 332, 333, 579 P.2d 1357 (1978) (examining tolling of probation by trial court); *Gillespie v. State*, 17 Wn. App. 363, 366-67, 563 P.2d 1272 (1977) (examining tolling of probation by superior court).

Myles further asserts that if the DOC could not toll a probationary period "then offenders who abscond from probation or community supervision will not face any penalties as long as they don't get caught within one (1) year of sentencing." Resp't's Opening Br. at 12.  But this overstates the consequences because the court still had the authority to extend the probationary period.  RCW 9.95.230.

### B. FORMER RCW 9.94A.501 (2005)

Furthermore, even if the misdemeanor probation was tolled, the 2005 amendments to former RCW 9.94A.501 (2003) prevented the DOC from supervising Villanueva-Villa after May 10, 2005, more than eight months before Villanueva-Villa caused the fatal accident.

In 2005, the legislature amended former RCW 9.94A.501 (2003), which had previously applied to only felony offenders on community custody, placement, or supervision, to include "every misdemeanor and gross misdemeanor probationer ordered by a superior court to probation under the supervision of the [DOC]." Former RCW 9.94A.501(2) (2005); LAWS OF 2005, ch. 362, § 1. This amendment took effect May 10, 2005. Under former RCW 9.94A.501 (2005), Villanueva-Villa's risk level was too low to trigger supervision and he did not fall into any of the specific categories of offenders that expressly required supervision,[14] and thus the DOC lacked the authority to supervise Villanueva-Villa on his misdemeanor conviction as well as the felony conviction after May 10, 2005, more than eight months before the fatal accident. As discussed above in section III, without the authority to supervise Villanueva-Villa, Myles cannot establish a take-charge relationship. And because Myles does not establish a take-charge relationship, Myles cannot establish that the DOC had a duty to prevent Villanueva-Villa from harming William Myles based on a failure to supervise Villanueva-Villa under the misdemeanor conviction.

### V. OCTOBER 2005 AMENDED SENTENCE AND NEGOTIATED SANCTION

As noted above, on October 11, 2005, after Villanueva-Villa had been arrested and held on outstanding warrants, the superior court issued an order modifying Villanueva-Villa's sentence,

---

[14] *See* former RCW 9.94A.501(2) (2005).

which imposed a 30-day sanction. The DOC held a negotiated sanction hearing with Villanueva-Villa on October 20. On October 21, the negotiated sanction requiring Villanueva-Villa to report to the DOC for 30 days and to provide a valid address immediately was entered in the superior court. The negotiated sanction stated that supervision would end March 5, 2006. Myles argues that the superior court's October 11, 2005 order, the resulting October 21 negotiated sanctions, and the DOC's subsequent monitoring of Villanueva-Villa reestablished a take-charge relationship.[15]

Even if the trial court's October 11, 2005 order extended Villanueva-Villa's community custody or misdemeanor probation and DOC was monitoring Myles after October 21, the DOC had no authority to supervise Villanueva-Villa on his felony or misdemeanor convictions. As discussed above in section III, as of July 1, 2003, the DOC was no longer authorized to supervise Villanueva-Villa on his felony conviction. The DOC recognized they lacked authority to supervise Villanueva-Villa and actually terminated DOC supervision as of January 13, 2006.[16] And as of May 10, 2005, the DOC was no longer authorized to supervise Villanueva-Villa on his misdemeanor conviction. Because the DOC had no authority to supervise the felony community custody or misdemeanor probation there was no take-charge relationship and no duty to prevent Villanueva-Villa from harming William Myles.

Myles fails to establish a take-charge relationship under either the felony or misdemeanor convictions. Without such a relationship, the DOC had no duty to prevent Villanueva-Villa from

---

[15] We note that Myles does not argue that a duty to protect William Myles arose under the voluntary assumption of duty doctrine.

[16] We are not presented with the question and we do not decide what would have been the result had DOC not terminated supervision.

No. 49928-2-II

harming William Myles, and the trial court erred when it denied the DOC's motion for summary judgment. Accordingly, we reverse the trial court and remand for the trial court to enter an order dismissing the DOC.

A majority of the panel having determined that this opinion will not be printed in the Washington Appellate Reports, but will be filed for public record in accordance with RCW 2.06.040, it is so ordered.

JOHANSON, J.

We concur:

MAXA, C.J.

SUTTON, J.